# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0107

═══════════

ALBERT G. HILL, JR., PETITIONER,

v.

SHAMOUN & NORMAN, LLP, RESPONDENT

═══════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════

**Argued October 10, 2017**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE GUZMAN did not participate in the decision.

This case involves a law firm's quantum-meruit suit for the reasonable value of its services in assisting its client reach a comprehensive settlement of various lawsuits filed against him. We must decide whether Texas Government Code section 82.065 or our common law permits the firm's quantum-meruit recovery for services it performed under an unenforceable contingent-fee agreement and whether the firm's damages expert improperly based his damages model on that agreement. We hold that despite the firm's lack of a signed writing, the statute of frauds does not preclude its quantum-meruit claim. In addition, we hold that there was sufficient evidence to demonstrate that the firm performed compensable services in negotiating the global settlement. However, we hold

that the expert's opinion as to the reasonable value of the firm's services cannot be given legal weight, and without it, there is legally insufficient evidence to support the jury's award. Because there is some evidence of the reasonable value of the firm's services, we reverse the part of the court of appeals' judgment that reinstated the jury's award and remand the case to the trial court for a new trial on the amount of the firm's recovery.

## I. Background

Albert G. Hill, Jr. (Hill) became involved in contentious litigation with his son, Albert Hill, III (Hill III) and numerous other parties beginning in 2007. These lawsuits, referred to as the "spider web of litigation," involved other members of the Hill family, family trusts, trustees, and various business entities. In February 2010, this web of litigation comprised more than twenty lawsuits, spanning multiple courts and involving approximately one hundred lawyers representing various parties and entities.

Shamoun & Norman, LLP (S&N) initially became involved in the web of litigation in 2009. Hill and Gregory Shamoun signed two limited-engagement agreements for S&N's representation in what the parties refer to as the "Abbott Financial" case (agreement signed November 19, 2009) and the "Bordeaux Trust" case (agreement signed January 15, 2010). The Abbott Financial case involved the collection of a debt against Hill III, and the Bordeaux Trust case involved a suit alleging that Hill and his wife withdrew money from a trust for their own benefit. Shamoun testified that at the time he was retained for representation in those two cases, he had not yet engaged in "global settlement negotiations" for Hill.

In March 2010, Hill was also facing a federal civil RICO lawsuit, set for trial in May 2010, in which $1 billion in damages were sought against him by Hill III and other family members for alleged impropriety in withdrawing and distributing funds related to various trusts (the "RICO case"). At an earlier point in the RICO case, Hill had been sanctioned and held in contempt for filing a false affidavit. This contempt order frustrated Hill's settlement efforts, and as of March 2010, settlement negotiations had effectively halted.

On March 5, 2010, Frances Wright, Hill's personal attorney, asked Shamoun to attend a meeting with the lawyers for the trust, trustees, and Hill's family because Hill needed to find "a person who could be one voice for the group" and deal with Hill III's lead attorney, Steven Malouf. Shamoun attended the meeting, and though he did not formally become settlement-negotiations counsel at that time, he began communicating and negotiating with Malouf about a global settlement. According to Malouf, settlement negotiations became "very active" when he started dealing with Shamoun, and Shamoun "reenergized" the settlement discussions. In early- to mid-March, Shamoun offered Malouf's clients $55 million to settle, but they rejected the offer. Malouf emailed Shamoun on March 27, expressing his lack of interest in settling and stating, "We just need to let the jury decide."

Hill claims that Shamoun first requested a potential discretionary bonus in a meeting sometime in the first week of March. Hill claims he told Shamoun he would consider it, and that as Hill understood it, he had unfettered discretion in whether there would be a bonus and how much any bonus might be.

On March 27, Wright called Shamoun on behalf of Hill and explained that Hill wanted Shamoun to get involved in the RICO case and work toward a global resolution of the cases composing the web of litigation before the RICO trial in May. Wright discussed Hill's desire to increase his outstanding settlement offer from $55 million to $73 million, and authorized Shamoun to make this offer to Malouf to settle all pending cases. In this conversation, Wright also told Shamoun that Hill had offered to pay him a bonus based on this settlement offer—Hill would pay Shamoun 50% of the savings, if any, between the $73 million ceiling and the cash component of the global settlement if that resolution was reached before the RICO trial in May. As Shamoun understood it at the time, Hill would keep the other 50% of any settlement savings. If a global settlement was achieved for $73 million or more, Shamoun understood that under Hill's offer he would receive nothing.

Shamoun immediately relayed the $73 million settlement offer to Malouf, who again indicated no interest in settling. After this rejection, Shamoun called Hill. Shamoun told Hill that he and Wright had spoken earlier that day, and Wright had relayed Hill's desire for a global resolution of all the cases in the web of litigation and had extended Hill's settlement-bonus offer to achieve that end. Shamoun claims that in this conversation he formally accepted Hill's offer. Shamoun's understanding of his obligation under this alleged oral contingent-fee agreement was to achieve a global resolution of all the cases in the web of litigation before the RICO trail and have the trial court vacate the contempt order against Hill.

In April 2010, after Hill's counsel withdrew in the RICO case, Shamoun agreed to formally represent Hill in that case and in a separate probate case. Hill and Shamoun executed two hourly

4

fee, limited-engagement agreements on April 12 and April 13—bringing the total to four written engagement agreements between Hill and Shamoun.

On April 30, Shamoun and Hill were summoned to the federal courthouse to discuss the status of the settlement. Shamoun and Hill both testified that during their visit to the courthouse, Shamoun told Hill three times to "remember my bonus," and that each time Hill confirmed that he remembered. Hill testified that he thought Shamoun's request was odd, and he later told Wright about the exchange.

On May 2, Wright presented to Hill a document entitled "Performance Incentive Bonus." Wright testified that she prepared the document in May, that she alone drafted it, and that the document correctly represented the oral contingent-fee agreement Shamoun reached with Hill. The document, which was introduced into evidence by both parties, stated: "The performance incentive bonus shall be calculated as the delta between $55 million and $73 million, and shall be split 50/50 between Law Offices of Frances Johnson Wright, P.C. and Shamoun and Norman." Shamoun testified he had not seen the document before it was presented to Hill and had no part in drafting it. When Wright presented the document to Hill, Hill refused to sign it.

A settlement conference was ordered in the RICO case for May 4, 2010, before federal Magistrate Judge Paul Stickney. In attendance were Shamoun, Hill, Hill III, and Hill III's attorney, Charla Aldous. At this conference, Shamoun communicated Hill's settlement terms to Hill III and his attorney. Aldous said the terms included, but were not limited to, vacating federal orders from the federal lawsuit and settling the cases composing the web of litigation. No settlement documents were signed at that time, but the parties were back in court the next day for a court-ordered

5

mediation. Later that day, Shamoun discovered Wright's failed attempt to memorialize the oral contingent-fee agreement. Shamoun called Hill that evening to ask about it and recorded the conversation, unbeknownst to Hill. Hill, in response to Shamoun's inquiry about whether the two had an agreement, stated, "we need to make a deal that is understandable and reasonable. You know, that has some relevance and makes sense." Hill and Shamoun spoke again by phone later that evening. Hill testified that in this call he fired Shamoun, but Hill admitted that he "should have elaborated a bit more." Shamoun's understanding of that conversation was not that Hill had fired him, but merely that Hill told him that two other attorneys, Keith Benedict and Ty Miller, would be taking the lead at the mediation the next day. Shamoun thought this made sense because those attorneys were more familiar with the specific trust and tax issues at hand.

Shamoun presented text messages and emails showing that he was still in contact with Benedict and Miller about the settlement agreement on the morning of May 5. Shamoun attended the mediation on May 5 but left early. Before he left, Shamoun asked Hill about the oral contingent-fee agreement again and told Hill not to have a "selective memory," to which Hill responded, "Trust me." The final settlement terms were read into the record at the end of the mediation on May 5, and a formal settlement agreement was signed on May 13, 2010.

There is disputed testimony as to who negotiated the final settlement. Aldous and Malouf testified that the terms Shamoun discussed prior to and on May 4 became part of the settlement agreement signed on May 13. Hill, Benedict, and Judge Stickney—who acted as mediator—testified that Shamoun was not involved and did not settle the web of litigation on May 5. Judge Stickney

6

testified that during Shamoun's brief time at the mediation on May 5, Shamoun said he was not representing Hill in the mediation because of a disagreement.

On May 17, 2010, Hill sent Shamoun a formal letter terminating his representation in all matters. The letter stated:

> As you know, I terminated your representation of me as settlement counsel prior to the global settlement in the cases in which you were providing representation. Given the claim you and Frances Wright have made to a fee contingent on the terms of that settlement, I think it would be better if you and I fully disengaged.

On August 16, 2010, S&N sent Hill a demand letter claiming $11,250,000 for its legal services. Hill declined to pay this amount, but he did satisfy all other fee obligations relating to the four written engagement agreements between him and S&N.

S&N subsequently brought suit against Hill for breach of contract, fraud, fraudulent inducement, civil conspiracy, quantum meruit, quasi-estoppel, exemplary damages, and attorney's fees.[1] Hill filed counterclaims against S&N and Shamoun for breach of fiduciary duty, breach of contract, and civil conspiracy. Before trial, the trial court granted Hill's summary judgment motion on S&N's breach-of-contract and quasi-estoppel claims, and S&N abandoned its civil-conspiracy claim against Hill. The case went to trial on S&N's quantum-meruit, fraud, and fraudulent-inducement claims and Hill's counterclaims. The trial court granted Hill's motion for directed verdict on S&N's fraud and fraudulent-inducement claims, but it denied his motion for directed verdict on quantum meruit.

---

[1] S&N also asserted various causes of action against Benedict, Miller, and AG Hill Partners, LLC, but later nonsuited those claims.

At trial, S&N's counsel conceded that the "Performance Incentive Bonus" was unenforceable because it was an oral contingent-fee agreement. S&N's damages expert, Richard Sayles, testified at trial to the reasonable value of S&N's services by considering the factors laid out in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).[2] Sayles discussed each factor individually and concluded that the reasonable value of S&N's services in reaching a global settlement of the web of litigation was $15,912,500—the same amount that S&N would be entitled to had the "Performance Incentive Bonus" been an enforceable contract. On direct examination, Sayles indicated that he calculated this number based on the terms of the oral contingent-fee agreement that Shamoun alleges he and Hill entered into on March 27, 2010.[3] On cross examination, Sayles further admitted that his opinion was based on the assumption that this alleged agreement was enforceable.[4] Shamoun testified that he worked between 150 and 400 hours

[2] The factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen*, 945 S.W.2d at 818.

[3] On direct examination, Sayles testified:

[A]s I understand it, the value on the services between [Shamoun] and [Hill] was that the cash component of the overall settlement, being half of the difference between 73 million and whatever the cash component turned out to be . . . . [T]he cash component was about 41.175 million. So you do the math on that and it comes up to the fee that I gave you.

[4] On cross examination, Sayles testified:

Q: [Y]our opinions are based on the assumption that Mr. Hill promised a mandatory bonus to Mr.

8

performing global settlement services for Hill, but, in contrast to his work under the four engagement agreements, he did not keep records of his time on this matter. Sayles admitted that his opinion as to the reasonable value of S&N's services would not be justified based on a time factor alone.

Hill's defense at trial was that Shamoun's so-called "global settlement services" were actually services already covered under the four engagement agreements the parties executed prior to the alleged oral contingent-fee agreement, thus preventing S&N's recovery under quantum meruit. Hill offered each engagement agreement into evidence at trial. Shamoun's fee under those agreements ranged from $400 to $650 per hour. Shamoun testified that in 2010 he charged his clients anywhere from $275 to $600 per hour.

The jury found in favor of S&N on its quantum-meruit claim, concluding that (1) S&N had provided compensable global settlement services for Hill, and (2) the reasonable value of S&N's compensable global settlement services was $7,250,000. The jury did not award S&N any attorney's fees. The jury also found in S&N's favor on all of Hill's counterclaims. In response to this verdict, Hill filed a motion to determine appropriate equitable relief and set aside the jury findings, and S&N filed a motion to disregard the jury's award of zero attorney's fees. The trial court granted Hill's motion, setting aside the jury's quantum-meruit findings and rendering a take-nothing judgment. S&N appealed.

---

Shamoun. That's fair, right?
A: I believe that [Hill] agreed to that bonus as being the fair value of achieving a global settlement as Gregory Shamoun described in his own testimony.
Q: And that's an assumption you're making?
A: That's what I am basing my opinion on, I don't have anything beyond that.

9

The court of appeals reversed, holding that the trial court should not have granted Hill's motion to disregard because the verdict conflicted with Texas Government Code section 82.065 and there was legally sufficient evidence to support the jury's finding both that S&N provided compensable global settlement services and that the monetary value of those services was $7,250,000. 483 S.W.3d 767, 779–80 (Tex. App.—Dallas 2016, pet. granted). In determining that there was sufficient evidence to support this award, the court of appeals relied primarily on Sayles's expert opinion. *Id.* at 785–89.

In this Court, Hill presents two issues in support of his position that the court of appeals erroneously reinstated the jury verdict that the trial court set aside. First, Hill raises a legal question—whether Texas Government Code section 82.065, a statute of frauds that requires contingent-fee contracts for legal services be signed and in writing, precludes a law firm's quantum-meruit recovery as a matter of law for legal services performed under an alleged oral contingent-fee agreement. *See* TEX. GOVT. CODE § 82.065. Second, Hill contends that the court of appeals' decision violates equitable principles governing quantum meruit, including that the ultimate decision on the amount of equitable relief to be awarded belongs to the trial court. We address each issue in turn.

## II. S&N's Quantum-Meruit Claim

We first address Hill's contention that the court of appeals' decision violates the statute of frauds by reinstating a jury verdict that gives legal effect to an unenforceable oral contingent-fee agreement. Specifically, we must determine whether Texas Government Code section 82.065

10

precludes S&N's quantum-meruit recovery as a matter of law for the global settlement services Shamoun provided. We hold it does not.

## A. Statute of Frauds

Quantum meruit is an equitable remedy that is "based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005). The purpose of this common law doctrine is to prevent a party from being "unjustly enriched" by "retain[ing] the benefits of the . . . performance without paying anything in return." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). To recover under a quantum-meruit claim, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged. *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). A party generally cannot recover under a quantum-meruit claim when there is a valid contract covering the services or materials furnished. *In re Kellogg Brown & Root*, 166 S.W.3d at 740. The measure of damages for recovery under a quantum-meruit theory is the reasonable value of the work performed and the materials furnished. *E.g.*, *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 796 (Tex. App.—Dallas 2007, no pet.).

The court of appeals relied in part on Texas Government Code section 82.065(c) in holding that S&N's quantum-meruit claim was permissible despite the fact that the parties lacked a signed agreement. 483 S.W.3d at 778–80. Section 82.065 currently reads:

11

(a)    A contingent fee contract for legal services must be in writing and signed by the attorney and client.

(b)    Any contract for legal services is voidable by the client if it is procured as a result of conduct violating Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas, regarding barratry by attorneys or other persons.

(c)    Any attorney who was paid or owed fees or expenses under a contract that is voided under this section may recover fees and expenses based on a quantum meruit theory if the client does not prove that the attorney committed barratry or had actual knowledge, before undertaking the representation, that the contract was procured as a result of barratry by another person. To recover fees or expenses under this subsection, the attorney must have reported the misconduct as required by the Texas Disciplinary Rules of Professional Conduct of the State Bar of Texas, unless:
(1)    another person has already reported the misconduct; or
(2)    the attorney reasonably believed that reporting the misconduct would substantially prejudice the client's interests.

TEX. GOVT. CODE § 82.065. The court of appeals reasoned that even if Hill and S&N's oral contingent-fee agreement was void under subsection (a) because it was not it writing, subsection (c) permits an attorney to recover fees owed under quantum meruit. 483 S.W.3d at 779. Thus, the fact that the parties' oral contingent-fee agreement was unenforceable under the statute of frauds did not preclude S&N's quantum-meruit claim. *Id.*

Whether a contract falls within the statute of frauds is a question of law, which we review de novo. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013). Section 82.065, enacted in 1989, originally consisted of only subsections (a) and (b). Act of May 29, 1989, 71st Leg. R.S., ch. 866, § 3, 1989 Tex. Gen. Laws 3855, 3857. In 2011, the Legislature added subsection (c) and broadened subsection (b) to apply to "any contract for legal services" rather than only a "contingent fee contract." Act of May 19, 2011, 82d Leg., R.S., ch. 94, § 4, sec. 82.065(b), (c), 2011 Tex. Gen.

12

Laws 534, 534–35. Subsection (b) was further amended in 2013. Act of May 17, 2013, 83d Leg., R.S., ch. 315, § 1, sec. 82.065(b), 2013 Tex. Gen. Laws 1073, 1075 (narrowing subsection (b)'s applicability by removing "the laws of this state" and replacing it with "Section 38.12(a) or (b), Penal Code or Rule 7.03").

Hill and S&N agree that the court of appeals erred in applying subsection (c) because the alleged oral contingent-fee agreement would have been entered into before the enactment of that subsection.[5] The 2011 version of section 82.065, effective September 1, 2011, and the 2013 version, effective September 1, 2013, do not apply to contracts entered into prior to their effective dates. § 4, sec. 82.065(b), (c), 2011 Tex. Gen. Laws at 535 ("Section 82.065, Government Code, as amended by this Act, applies only to a contract entered into on or after the effective date of this Act. A contract entered into before the effective date of this Act is governed by the law in effect immediately before the effective date of this Act, and that law is continued in effect for that purpose."); § 1, sec. 82.065(b), 2013 Tex. Gen. Laws at 1075 (using the same language as the 2011 Act). S&N and Hill allegedly entered into the unenforceable oral contingent-fee agreement in 2010. Thus, the court of appeals was required to apply the 1989 version of section 82.065, which did not contain subsection (c).

S&N concedes that the alleged oral contingent-fee agreement is unenforceable under section 82.065(a), but argues it is nevertheless entitled to the reasonable value of its services under a quantum-meruit theory in order to prevent Hill's unjust enrichment. Hill argues that S&N's claim

---

[5] Hill further argues that the court of appeals erred in applying subsection (c) because it applies only to contracts procured through barratry. Because we hold that the court of appeals erred in relying on subsection (c) based on the subsection's effective date, we do not address this argument.

13

is an attempt to circumvent the statute of frauds and give effect to an otherwise unenforceable contingent-fee agreement. The statute of frauds, Hill argues, dictates that attorney's fees cannot be based on a measure that is contingent on the result.

Whether the statute of frauds bars recovery for a non-contract claim depends on the nature of the damages the plaintiff seeks to recover. *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007); *Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001). In *Haase*, we held that the statute of frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the statute of frauds. 62 S.W.3d at 799. We relied on this holding in *Sonnichsen* when we held that the statute of frauds barred a volleyball coach's fraud claim for benefit-of-the-bargain damages when the claim arose from an unenforceable oral employment contract. 221 S.W.3d at 637. We noted, however, that the statute of frauds does not bar recovery of out-of-pocket damages for fraud, and if Sonnichesen had sought such restitution-based damages, his suit would have been viable. *Id.* at 636.

Here, S&N initially pled a claim for breach of the alleged oral contingent-fee agreement, seeking the benefit of that bargain. But before trial, the court granted Hill's summary judgment motion on the breach-of-contract claim, and S&N's only issue submitted to the jury was on quantum meruit. The jury charge tracked the Pattern Jury Charge on quantum-meruit damages, asking (1) whether S&N performed "compensable global settlement services" for Hill, and if so, (2) what was the "reasonable value of such compensable global services at the time and place they were performed." *See* Comm. on Pattern Jury Charges, State Bar of Tex., TEX. PATTERN JURY CHARGES: BUSINESS, CONSUMER, INS. & EMPLOYMENT 115.7 (2012). Thus, S&N sought

14

only the reasonable value of its services in assisting Hill reach a global settlement, not the benefit of its bargain under the alleged oral contingent-fee agreement.

Further, despite Texas Government Code section 82.065(c)'s inapplicability in this case, the common law has provided for quantum-meruit recoveries for attorneys who did not have written contingent-fee agreements that complied with subsection (c). For example, in *Celmer v. McGarry*, 412 S.W.3d 691 (Tex. App.—Dallas 2005, pet. denied), the court of appeals rejected an attorney's argument that a series of emails constituted evidence of a contingent-fee agreement but held that the attorney was permitted to recover the reasonable value of his services in quantum meruit. *Id.* at 707–08 ("[W]here a written contract is unenforceable, a plaintiff is not barred from recovery in quantum meruit."); *see also In re Webber*, 350 B.R. 344, 381–82 (Bankr. S.D. Tex. 2006) (mem. op.) (applying Texas law, "[t]his Court finds that even if the oral contingency fee agreement is void [under section 82.065(a)], [the attorney] may recover attorney's fees on the equitable principle of quantum meruit").

"The purpose of the Statute of Frauds is to remove uncertainty, prevent fraudulent claims, and reduce litigation." *Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984). This Court has recognized that attorney-client contracts "are [to be] closely scrutinized." *Anglo-Dutch Petrol. Int'l v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 450 (Tex. 2011). Section 82.065(a)'s requirement that such agreements be in writing and signed by both parties makes clear the Legislature's concern that clients are aware of the terms of their contracts for legal services. *See* TEX. GOV'T CODE § 82.065(a). This concern, however, does not preclude an attorney's recovery for the reasonable value of his or her services under the equitable theory of quantum meruit. *See, e.g.*, *Celmer*, 412

15

S.W.3d at 708. To hold otherwise would allow some clients to be unjustly enriched by retaining the benefits of an attorney's performance without paying anything in return. *See Truly*, 744 S.W.2d at 938. Accordingly, we hold that Texas Government Code section 82.065(a) does not preclude a law firm's quantum-meruit suit to recover the reasonable value of legal services performed under an unenforceable agreement.

The court of appeals relied on *Enochs v. Brown*, 872 S.W.2d 312, 321 (Tex. App.—Austin 1994, no writ), *disapproved on other grounds*, *Roberts v. Williamson*, 111 S.W.3d 113 (Tex. 2003) (addressing whether parents of injured children may recover loss-of-consortium damages), in permitting S&N's quantum-meruit claim. 483 S.W.3d at 779. Though we similarly hold that Texas Government Code section 82.065(a) does not preclude S&N's claim despite the lack of a signed writing, the court of appeals' analysis in *Enochs* conflicts with our later decision in *Quigley v. Bennett*, 227 S.W.3d 51 (Tex. 2007), and thus did not influence our opinion.[6]

## B. Legal Sufficiency of the Evidence

Having determined that the statute of frauds does not preclude S&N's quantum-meruit claim as a matter of law, we next consider Hill's argument that the jury verdict fails because the jury's quantum-meruit findings are not supported by legally sufficient evidence. We hold that there was

---

[6] In *Enochs*, the court of appeals affirmed an attorney's recovery of fees based on a written contingent-fee contract that was signed only by the client despite Texas Government Code section 82.065(a). 872 S.W.2d at 317–19. The court reasoned that subsection (a)'s purpose was fulfilled because the client's signature demonstrated her awareness of the contingent-fee arrangement and because the attorney had fully performed. *Id.* at 318. The court next addressed the alternative quantum-meruit holding in the event that the contract was not enforceable. *Id.* at 320. In reviewing the appellant's no-evidence challenge, the court considered the client's mother's testimony that "she understood that [the lawyer's] fee would be one-third of [the client's] recovery." *Id.* at 321. Given our later holding in *Quigley*, it was improper for the court to consider evidence of the value of the unenforceable contingent-fee agreement as evidence supporting quantum-meruit recovery. *See* discussion *infra*.

legally sufficient evidence to support the jury's determination that S&N performed compensable global settlement services for Hill. However, because there was some evidence of the value of S&N's services, but not enough to support the jury's award, we reverse the part of the court of appeals' judgment that reinstated the jury's verdict and remand the case to the trial court for a new trial on the amount of S&N's recovery. *See Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam) (reversing and remanding for a new trial on attorney's fees when there was evidence that services provided some value but insufficient evidence to support the full fee requested).

Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citations omitted). "In determining whether there is no evidence of probative force to support a jury's finding, all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered," *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), including evidence offered by the opposing party that supports the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) ("Nor can evidence supporting a verdict be identified by which party offered it . . . .").

As stated above, to recover under a quantum-meruit theory, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged;

17

(3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged. *Vortt Exploration Co.*, 787 S.W.2d at 944. A party must introduce evidence on the correct measure of damages to recover on a quantum-meruit claim, meaning that the party must establish the reasonable value of work performed or materials furnished. *LTS Group, Inc. v. Woodcrest Capital, L.L.C.*, 222 S.W.3d 918, 920–21 (Tex. App.—Dallas 2006, no pet.). A quantum-meruit claim does not proceed on a contract for a specified price, but proceeds independently of a contract to recover the value of the services rendered or materials furnished. *Air Conditioning, Inc., v. L.E. Travis & Sons, Inc.*, 578 S.W.2d 554, 556 (Tex. Civ. App.—Austin 1979, no writ). When an attorney attempts to support a quantum-meruit claim with a bare contingent-fee percentage and no supporting evidence of the value of services rendered, courts deem the claimed contingent-fee agreement "no evidence" of the reasonable value of the services performed. *E.g.*, *Ray v. T.D.*, No. 03-06-00242-CV, 2008 WL 341490, at *7–8 (Tex. App.—Austin Feb. 7, 2008, no pet.) (mem. op.); *see also Girards v. Frank*, No. 3:13-cv-2695-BN, 2016 WL 454465, at *10 (N.D. Tex. Feb. 5, 2016) (stating that the law firms' expected percentage of fee-sharing under an unenforceable agreement was not evidence of the specific value of the work performed). Additionally, evidence of the value of an agreement that is unenforceable under the statute of frauds "cannot be given any weight or effect and legally cannot be considered as evidence supporting the jury's finding." *See Quigley*, 227 S.W.3d at 54.

Hill argues that S&N's quantum-meruit claim fails because Shamoun's so-called "global settlement services" were actually services already covered under the four signed engagement agreements. Additionally, Hill argues that our holding in *Quigley* means that the value of the alleged unenforceable oral contingent-fee agreement between Hill and Shamoun cannot be given any legal weight, thus prohibiting consideration of Sayles's expert opinion, which relied on the terms of that agreement.[7] Because Sayles's opinion is the only evidence S&N offered as to the reasonable value of its services and it cannot be considered, Hill argues, there is no evidence to support the jury's award. S&N argues that Sayles's opinion is permissible because his calculation of the reasonable value of S&N's services did not rely exclusively on the oral contingent-fee agreement; Sayles also offered opinions as to why the reasonable fee he proffered was appropriate under each of the *Arthur Andersen* factors.

A party generally cannot recover under a quantum-meruit theory when there is a valid contract covering the services or materials furnished. *In re Kellogg Brown & Root*, 166 S.W.3d at 740. However, the existence of an express contract does not preclude recovery in quantum meruit for the reasonable value of work performed and accepted which is not covered by an express contract. *Black Lake Pipe Line Co. v. Union Const. Co.*, 538 S.W.2d 80, 86 (Tex. 1986), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989). The question of

---

[7] S&N claims Hill waived this evidentiary challenge because Hill did not object at trial to Sayles's calculation as inadmissible under *Quigley* or Texas Government Code section 82.065. Hill's motion for directed verdict and renewed motion for directed verdict argued, however, that S&N's only damages evidence was the oral agreement and the statute of frauds bars recovery based on the oral agreement—thus preserving his legal sufficiency challenge. *See Office of the Atty. Gen. v. Burton*, 369 S.W.3d 173, 175 (Tex. 2012) (per curiam) ("As a general rule, an appellant must first complain to the trial court by a timely request, objection, or motion and obtain a ruling as a prerequisite for appellate review of that complaint, but the general rule does not apply to complaints about the sufficiency of the evidence in a trial to the court.").

whether an express contract covers the services at issue is a legal question reviewed de novo. *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Each of the four written limited-engagement agreements, signed by Hill and Shamoun on behalf of S&N, covers "reasonable and necessary legal services, including, without limitation, conducting a preliminary investigation; drafting documents, correspondence, and pleadings; motion practice; conducting and defending discovery; attending mediation and trial; and drafting settlement documents." However, the agreements also contain language limiting the scope of services to the specifically named cause of action, such as: "[This] Engagement is not general in nature, but is limited to the definition of 'Engagement' contained herein, and . . . S&N shall perform the Engagement but shall be under no obligation to perform services not within the scope of the Engagement." Thus, nothing in these agreements granted S&N authority to engage in global settlement services regarding the various lawsuits in the web of litigation. Further, Shamoun's initial contact with Malouf about a global settlement was over a month before the parties executed the third and fourth engagement agreements in which Shamoun replaced Hill's lead attorney in the RICO case. Therefore, we agree with the court of appeals that the four limited-engagement agreements do not encompass any services S&N provided in negotiating the global settlement.

We also agree that there was legally sufficient evidence to support the jury's finding that S&N performed global settlement services for Hill outside of those four engagement agreements and that Hill was aware Shamoun expected to be paid for these services. The jury heard extensive testimony from Shamoun about how he worked as the "one voice" across Hill's approximately one

20

hundred lawyers in seeking a global resolution of the cases composing the web of litigation. The jury heard testimony that Shamoun's services avoided over $1 billion in liability exposure for Hill, achieved dismissal of more than twenty contentious and expensive legal battles, and resulted in a federal judge vacating a perjury finding against Hill. Malouf, Hill III's lead attorney, testified that from the end of March to May 1, 2010, only he and Shamoun engaged in settlement discussions. Malouf described the discussions as "intensive" and involving twelve- to fifteen- hour days. Several witnesses testified that Shamoun relayed Hill's primary settlement terms to Hill III and his attorney at the May 4 settlement conference, and that it was at this conference that the parties reached a global resolution in principle of all the cases composing the web of litigation. Malouf testified that the "genesis of those terms [in the final settlement agreement] was the discussions [he] had with Mr. Shamoun." Finally, the jury heard an audio recording of the phone conversation that took place after that settlement conference between Hill and Shamoun, in which Hill acknowledged that Shamoun should be compensated for his services, but said the parties need to make a deal that was "understandable and reasonable." Reviewing the record in the light most favorable to the jury's finding, we conclude that S&N presented more than a mere scintilla of evidence to support the jury's finding that Shamoun provided Hill valuable, compensable global settlement services.

We next examine whether there was legally sufficient evidence to support the jury's award of $7,250,000 as the reasonable value of those services. In evaluating legal sufficiency, we must first determine whether, as Hill argues, Sayles's expert testimony cannot be given legal weight under our holding in *Quigley*, or whether, as S&N argues, *Quigley* is distinguishable.

21

In *Quigley*, a geologist named Bennett agreed to help Quigley analyze Bennett's interest in some oil and gas leases in anticipation of selling those interests. 227 S.W.3d at 52. The parties had no written or oral agreement as to Bennett's compensation. *Id.* Sometime after the project was completed and Bennett had not been paid, he sued Quigley for fraud and quantum meruit, alternatively, seeking the value of a royalty interest as damages. *Id.* at 53. At trial, Bennett presented evidence that geologists are usually compensated with overriding royalty interests in the prospects they help generate, and that the value of a 1% overriding royalty interest in the past and estimated future production of the leases Bennett's work helped Quigley sell was approximately $4 million. *Id.* Quigley offered evidence that geologists who work for cash compensation rather than overriding royalty interests earned between $500 a day and $20,000 per job. *Id.* The jury awarded Bennett $1 million on his fraud claim and $2,500 on his quantum-meruit claim, and the court of appeals affirmed. *Id.* at 53–54.

We reversed, holding that because there was no written agreement and an agreement to transfer a royalty interest falls within the statute of frauds, evidence of the value of the interest could not be given any legal effect in support of a damages award on Bennett's fraud claim. *Id.* at 54–55. Allowing such evidence would "circumvent the protections of the statute [of frauds]." *Id.*; *see also id.* at 57 (Brister, J., dissenting on other grounds) ("[T]he problem was not with the charge but with the evidence Bennett tried to squeeze into it. There was no evidence that generating geologists are paid $1 million in cash for their services; the evidence showed they are paid royalty interests, which are sometimes worth $1 million and sometimes worth nothing. As the Statute of Frauds prevents

22

enforcement of oral contracts for royalty interests, it likewise prevents an action for damages measured by that amount.").

The Legislature has made clear that a contingent-fee contract for legal services must be in writing and signed by the attorney and client to be enforceable. TEX. GOVT. CODE § 82.065(a). As in *Quigley*, allowing S&N to recover the value of the oral contingent-fee agreement would give effect to an otherwise unenforceable agreement. *See* 227 S.W.3d at 54. Thus, as we reasoned in *Quigley*, evidence of the oral contingent-fee agreement's value "cannot be given any weight or effect and legally cannot be considered as evidence supporting the jury's award." *Id.* Accordingly, we hold that an attorney's contingent-fee agreement that violates the statute of frauds cannot be considered as evidence of the reasonable value of that attorney's services.

S&N argues that *Quigley* is distinguishable because this holding was part of the Court's disposition of Bennett's fraud claim, whereas the Court reversed Bennett's quantum-meruit claim only on limitations grounds. The court of appeals distinguished *Quigley* for the same reason. 483 S.W.3d at 780. However, our holding is consistent with previous holdings that the statute of frauds bars recovery for non-contract claims if the plaintiff seeks to recover the benefit of his or her bargain. *See Sonnichsen*, 221 S.W.3d at 636; *Haase*, 62 S.W.3d at 800. This principle applies to any non-contract claim seeking benefit-of-the-bargain damages under an agreement voided by the statute of frauds, not merely fraud claims. *See Sonnichsen*, 221 S.W.3d at 636. Just as the plaintiff in *Quigley* sought the benefit of his bargain by offering evidence of the value of the overriding royalty interest, here, in offering an expert opinion that ultimately relied on the alleged oral contingent-fee agreement, S&N sought the benefit of its bargain under that alleged, unenforceable

23

agreement, even though it submitted its claim via a quantum-meruit theory. *See Haase*, 62 S.W.3d at 798–99 (noting that when the bargain violates the statute of frauds and is unenforceable, allowing recovery for benefit-of-the-bargain damages would deprive the statute of any effect).

S&N also attempts to distinguish *Quigley* on the basis that the value of a royalty interest does not inform the value of personal services the plaintiff rendered to the defendant as it does in this case. S&N cites a series of quantum-meruit cases in which courts considered the value of personal-service contracts as evidence of the value of personal services when they were supported by other evidence of value. However, in none of the cases S&N cites did the parties' contract violate the statute of frauds. *See, e.g.*, *Brender v. Sanders Plumbing, Inc.*, No. 2-05-00067-CV, 2006 WL 2034244, at *1–2 (Tex. App.—Fort Worth July 20, 2006, pet. denied) (mem. op.); *H.E. Butt Grocery Co. v. Rencare, Ltd.*, No. 04-03-00190-CV, 2004 WL 199272, at *1–2 (Tex. App.—San Antonio Feb. 4, 2004, pet. denied) (mem. op.). Here, we cannot conclude that the formula stated in the "Performance Incentive Bonus" is how both parties valued S&N's services when Hill disputes that he ever agreed to such an arrangement.

*Quigley* requires us to exclude the entirety of Sayles's opinion as to the reasonable value of S&N's services. Though he analyzed S&N's services under each *Arthur Andersen* factor separately, Sayles conceded that his final opinion was based on the assumption that Hill had agreed to the oral contingent-fee agreement. Because Sayles's testimony as to the value of S&N's services cannot be considered as a matter of law, the question becomes whether S&N provided other legally sufficient evidence of the reasonable value of its services.

Sayles's testimony is the only expert evidence S&N offered as to the reasonable value of its services. Shamoun, Malouf, Judge Stickney, and Sayles testified to the scope of the services and amounts at stake in the litigation, and Shamoun estimated that he worked between 150 and 400 hours performing global settlement services. Only Sayles offered an actual dollar amount as to the reasonable value of S&N's services. Hill offered evidence that Shamoun's hourly rate under the limited fee agreements—which Hill argued covered all of Shamoun's work—was $650, the highest rate Shamoun had ever charged. As the court of appeals acknowledged, neither party offered evidence to the jury that an hourly rate times the number of hours worked was the proper method of calculating the reasonable value of Shamoun's services under his quantum-meruit claim. 483 S.W.3d at 787. Further, Hill did not object to the jury charge based on the argument that "reasonable value" should be defined as an hourly rate times the number of hours worked.

Considering the evidence offered by both parties and in the light most favorable to S&N, there is some evidence of the reasonable value of S&N's services. In *Quigley*, absent evidence of the overriding royalty interest, the only evidence of damages was that cash-based compensation for a geologist was between $500 a day and $20,000 per job. 227 S.W.3d at 53. We held that though this was some evidence of the value of Bennett's work, it was legally insufficient to support the entire $1 million fraud award, and we reversed the court of appeals' judgment. *Id.* at 54. However, because there was some evidence that Bennett suffered damages from Quigley's actions constituting fraud, we could not render judgment for Quigley on the fraud claim. *Id.* Similarly, the evidence of Shamoun's hourly rate under the limited-engagement agreements and the number of hours worked on the settlement services constitutes some evidence of the reasonable value of S&N's services.

25

Accordingly, we hold that the evidence is legally insufficient to support the jury's answer to the second question—that the reasonable value of S&N's compensable global settlement services was $7,250,000—but there was evidence to support some value.

### III. Trial Court's Discretion

In his second issue, Hill contends that even if S&N had a valid quantum-meruit claim and presented legally sufficient evidence to support the jury's findings, the court of appeals' reinstatement of the jury's verdict violated multiple equitable principles of quantum-meruit law. Hill's primary argument is that the court of appeals applied the wrong standard of review, which deprived the trial court of its ultimate discretion to determine equitable awards.

The parties debate the correct standard of review we should apply in reviewing the trial court's order disregarding the jury findings and rendering a take-nothing judgment. Hill argues that the court—not the jury—has ultimate discretion in fashioning equitable relief, and accordingly, the trial court's decision to set aside the jury's verdict and render a take-nothing judgment must be reviewed for an abuse of discretion. S&N claims that the jury's quantum-meruit findings are binding when supported by legally sufficient evidence and can be modified only when legally sufficient evidence supports an equitable departure from the jury's findings. Thus, according to S&N, the trial court's decision to disregard a jury finding must be reviewed under a legal sufficiency standard.

As noted above, quantum-meruit is an equitable remedy based upon the promise implied by law to pay for beneficial services rendered or materials furnished and knowingly accepted. *In re Kellogg Brown & Root*, 166 S.W.3d at 740; *Vortt Exploration Co.*, 787 S.W.2d at 944. Recovery

26

in quantum meruit will be had when nonpayment for the services rendered or materials furnished would result in an unjust enrichment to the party benefitted by the work. *Vortt Exploration Co.*, 787 S.W.2d at 944. As a general rule, the trial court, not the jury, determines the "expediency, necessity, or propriety of equitable relief." *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979). "[W]hen contested fact issues must be resolved before equitable relief can be determined, a party is entitled to have that resolution made by a jury." *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). "Once any such necessary factual disputes have been resolved, the weighing of all equitable considerations . . . and the ultimate decision of how much, if any, equitable relief should be awarded, must be determined by the trial court." *Hudson v. Cooper*, 162 S.W.3d 685, 688 (Tex. App.—[14th Dist.] 2005, no pet.) (citing *Burrow*, 997 S.W.2d at 245–46). When an attorney seeks fees for legal services in equity, "the issue for the jury is the value of the attorney's reasonable and necessary services, not whether a reasonable fee thus determined should nevertheless be withheld for some reason"—an "inherently equitable [decision that] must thus be made by the court." *Burrow*, 997 S.W.2d at 245–46. In making such equity determinations, the court should weigh equitable considerations particular to the case, but a trial court's discretion to determine equitable relief is not unlimited. *See id.* (discussing that in a fee forfeiture case, the court should consider "the adequacy of other remedies and the public interest in protecting the integrity of the attorney-client relationship, as well as the weighing of all other relevant considerations" and "whether a clear and serious violation of duty has occurred"); *Hudson*, 162 S.W.3d at 688 (instructing that in a quantum-meruit case, once the jury decides the disputed fact issues, the trial court should weigh "all equitable considerations (such as whether the defendant has been unjustly enriched, the plaintiff would be

27

unjustly penalized if the defendant retained the benefits of the partial performance without paying for them, and the plaintiff has 'unclean hands')"). A trial court's decision to reduce a jury's attorney's fee award for equity considerations is reviewed under an abuse of discretion standard and may be overturned only if it was arbitrary or unreasonable. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162–63 (Tex. 2004); *cf. Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 428–29 (Tex. 2008) (explaining that in "equitable actions, a jury may have to settle disputed issues about what happened, but 'the expediency, necessity, or propriety of equitable relief' is for the trial court, and its ruling is reviewed for an abuse of discretion") (quoting *Tex. Pet Foods*, 591 S.W.2d at 803).

We note, however, that we cannot determine what equitable factors—if any—the trial court considered in deciding to disregard the jury's answers and render a take-nothing judgment. The trial court granted Hill's motion to disregard the jury's findings without stating reasons. S&N subsequently filed a motion asking the court to provide reasons for disregarding the jury's verdict, which the trial court denied. The trial court did not enter findings of facts and conclusions of law, despite S&N's request. We also note that Hill submitted his cross-claims to the jury with questions asking whether Shamoun breached his fiduciary duty, engaged in a civil conspiracy, or breached contracts. The jury answered all questions in Shamoun's and S&N's favor, and Hill has not argued on appeal that either acted with unclean hands. *See In re Gamble*, 71 S.W.3d 313, 325 (Tex. 2002); *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.) ("A party seeking to invoke [the unclean hands] doctrine must show that he has been seriously harmed and the wrong complained of cannot be corrected without applying the doctrine.").

28

Nevertheless, for the reasons expressed in our discussion of the first issue, *see supra* Part II, in which we conclude that the evidence was legally insufficient to support the jury's full award, we hold that the trial court's decision to disregard the jury's damages finding was neither arbitrary nor unreasonable. The trial court did abuse its discretion by awarding S&N no attorney's fees, however, when there was legally sufficient evidence that S&N performed global settlement services for Hill and that Hill was aware Shamoun expected to be paid for those services. To hold otherwise would allow Hill to be unjustly enriched despite the promise implied by law to pay for beneficial services rendered and knowingly accepted. *See In re Kellogg Brown & Root*, 166 S.W.3d at 740.

Hill argues that the court of appeals violated three additional equity principles of law by: (1) reinstating a jury award that is not a "reasonable" value as required under a quantum-meruit theory, (2) allowing S&N to recover for services covered by a written contract, and (3) concluding that S&N met its burden of showing it would suffer an "unjust penalty" if it did not recover. First, because we hold that the court of appeals erred in reinstating the jury award and because we remand the case to the trial court for a new trial on this issue, we do not decide whether that award was "reasonable." Further, after examining the language used in the engagement agreements as discussed above, *see supra* Part II, we agree with the court of appeals that the global settlement services were not covered by existing contracts. *See In re Kellogg Brown & Root*, 166 S.W.3d at 740. Finally, Hill cites our decision in *Truly* for his argument that the court of appeals erred in concluding that S&N met its burden of showing that it would be unjustly penalized if it did not recover anything for its services. *See generally* 744 S.W.2d at 936–38. The agreement in *Truly* was a contract for construction services, and S&N argues that the "unjust penalty" equitable

29

consideration is limited to similar contracts where a contractor provides labor and materials to benefit the project owner. S&N argues that even if this equitable consideration does apply here, S&N was unjustly penalized by the trial court's take-nothing judgment. S&N is correct that we have not addressed unjust penalty as part of a plaintiff's burden in a quantum-meruit claim outside of construction contracts. *See id.* However, because we hold that the court of appeals erred in reinstating the jury's verdict and we remand the case for a new trial on this issue, we need not decide the applicability of this equitable consideration in this case.

## IV. S&N's Recovery

When a reversible error affects only part of a case, Texas Rule of Appellate Procedure 61.2 prohibits this Court from ordering a new trial solely on unliquidated damages if liability is contested. TEX. R. APP. P. 61.2. However, this Court has reversed and remanded for a new trial solely on unliquidated attorney's fees when liability was contested a number of times. *See, e.g.*, *Midland W. Bldg., L.L.C.*, 300 S.W.3d at 739–40; *Smith v. Patrick Y.T. Tam Trust*, 296 S.W.3d 545, 548–49 (Tex. 2009) (per curiam) (remanding for a new trial on attorney's fees when "the evidence did no more than raise a fact issue to be decided by the jury"); *A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007) (remanding for a new trial on attorney's fees when fees had not been segregated between claims for which fees are recoverable and those for which they are unrecoverable). In *Midland*, this Court reversed and remanded for a new trial on attorney's fees when the jury erroneously awarded no fees, despite evidence that the legal services rendered in defending the case provided some value, but there was insufficient evidence to support the full fee sought and awarded by the court of appeals. 300 S.W.3d at 739–40. Similarly, here we have

30

determined that there was legally sufficient evidence to support the jury's finding that S&N performed compensable global settlement services, and though the expert opinion cannot be considered as evidence because it gives effect to an unenforceable agreement, there is some evidence of the value of S&N's services to Hill. Here, the jury's determination on remand—that is, the reasonable value of legal services S&N provided Hill—is no different from jury determinations in the many cases in which this Court has remanded for a new trial to determine attorney's fees. *See, e.g.*, *id.*; *Patrick Y.T. Tam Trust*, 296 S.W.3d at 548–49; *A.G. Edwards & Sons, Inc.*, 235 S.W.3d at 710. Although Texas Rule of Appellate Procedure 61.2 prohibits us from ordering a new trial solely on unliquidated damages when liability is contested, *see* TEX. R. APP. P. 61.2, we see good cause to suspend that rule in this case because the determination of S&N's quantum-meruit recovery on remand amounts to a determination of reasonable attorney's fees. *See* TEX. R. APP. P. 2 (allowing this Court to suspend a rule's operation in order "to expedite a decision or for other good cause").

Additionally, we hold that attorneys seeking recovery for legal services under a quantum-meruit theory must show that the attorney's fee award is "reasonable" under *Arthur Andersen*. *See* 945 S.W.2d at 818. We note that *Arthur Andersen* suggests that a fact finder consider both "the amount involved and the results obtained" and "whether the fee is fixed or contingent." *Id.* Our holding, however, makes clear that evidence of an oral contingent-fee agreement prohibited by the statute of frauds is no evidence of the reasonable value of that attorney's services and cannot be considered. It follows, then, that neither the fee an attorney stood to earn under such an unenforceable fee agreement nor the specific result that would entitle the attorney to that contingent fee under the agreement constitutes evidence to be considered under the *Arthur Andersen* factors.

31

Thus, under these circumstances, when the attorney has performed services under an alleged contingent-fee agreement prohibited by the statute of frauds but has provided some value to the client, the alleged contingent-fee agreement is no evidence of the "reasonableness" of the value of the attorney's services. It is possible that in some circumstances the amount due under an unenforceable contingent-fee agreement and a reasonable attorney's fee will be the same. Here, a jury would have to find that the fee for Shamoun's 150 to 400 hours of work is "reasonable" under the *Arthur Andersen* factors. *See id*; *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 961 (Tex. 1996) (instructing that on remand "any fee awarded . . . should be tested against the lodestar approach to prevent grossly excessive attorney's fee awards").

## V.  Conclusion

We hold that Texas Government Code section 82.065 does not preclude a law firm's quantum-meruit recovery as a matter of law for legal services performed under an unenforceable contingent-fee agreement. In addition, we hold that there was legally sufficient evidence that S&N performed compensable services for Hill in negotiating the global settlement. We hold that the trial court did not abuse its discretion in disregarding the jury's finding of $7,250,000, but we reverse the court of appeals' judgment reinstating the jury's award of $7,250,000 because, though there was some evidence of value, that award was not supported by legally sufficient evidence. Accordingly, we remand the case to the trial court for a new trial on the amount of S&N's recovery, and equitable considerations regarding the value of S&N's services will be addressed in a new trial.

32

_____
Paul W. Green
Justice

**OPINION DELIVERED:**  April 13, 2018